IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | No. 12 CR 697 |
| ANTWAN JONES, ) | Judge Virginia M. Kendall |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

On March 5, 2014, a grand jury returned a thirteen-count superseding indictment against Defendant Antwan Jones and his two co-defendants[1], charging Jones with nine of the thirteen total counts. (Dkt. No. 65.) Specifically, the Superseding Indictment alleged that Jones conspired to possess with the intent to distribute and to distribute controlled substances in violation of 21 U.S.C. § 846 (Count One); distributed controlled substances in violation of 21 U.S.C. § 841(a)(1) (Counts Two, Six, & Nine); possessed with the intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count Four); used a communication facility in furtherance of the underlying conspiracy in violation of 21 U.S.C. § 843(b) (Counts Five & Seven); attempted to possess with the intent to distribute controlled substances in violation of 21 U.S.C. § 846 (Count Ten), and possessed a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (Count Eleven). (*Id.*) After a seven-day trial, a jury convicted Jones of all nine charged counts. (Dkt. No. 134.) Jones now moves for judgment of acquittal under Federal Rule

---

[1] Jones's co-defendants were James Jones and Calvin Nelson. For convenience, the Court refers to James Jones as "James" throughout this opinion.

of Criminal Procedure 29, arguing that there was insufficient evidence demonstrating his guilt.[2] (Dkt. No. 173.) Alternatively, Jones seeks a new trial under Federal Rule Criminal Procedure 33, alleging that new evidence has come to light since the jury's verdict and that a number of trial errors deprived Jones of a fair trial. Here, because there was abundant evidence to support the jury's verdict, the alleged new evidence is immaterial to Jones's conviction, and Jones completely failed to substantiate his arguments regarding any error, the Court denies Jones's motions. (Dkt. No. 173.)

I. The Record Contained Ample Evidence to Support the Jury's Verdict

A motion for judgment of acquittal challenges the sufficiency of the evidence against a defendant. *See* Fed. R. Crim. P. 29. Jones faces "a nearly insurmountable hurdle" in contending that the jury had insufficient evidence to convict him on any of the charged counts. *See United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (citing *United States v. Torres-Chavez*, 744 F.3d 988, 993 (7th Cir. 2014)). The Court now reviews the evidence in the light most favorable to the Government and makes all reasonable inferences in the Government's favor. *United States v. Cejas*, 761 F.3d 717, 726 (7th Cir. 2014); *United States v. Hassebrock*, 663 F.3d 906, 918 (7th Cir. 2011). The Court will uphold the jury's verdict if "any rational trier of fact" could have found the essential elements of the crime satisfied beyond a reasonable doubt. *See Miller*, 782 F.3d at 797 (citing *United States v. Molton*, 743 F.3d 479, 483 (7th Cir. 2014)). The Court may overturn the jury's guilty verdict "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones ("Jones II")*, 713 F.3d 336, 340 (7th Cir. 2013) (quoting *United States v. Stevenson*, 680 F.3d 854, 855-56 (7th Cir. 2012)).

---

[2] Jones's only specific attacks on the evidence are in reference to Counts One and Eleven. The Court, in an abundance of caution, nevertheless goes through the evidence pertaining to each count on which the jury convicted.

### A. Count One—Conspiracy

To prove Jones guilty of conspiring to distribute controlled substances in violation of Section 846, the Government needed to prove two elements: "(1) an agreement to commit an unlawful act; and (2) the defendant must have knowingly and intentionally joined that agreement." *United States v. Cruse*, 805 F.3d 795, 811 (7th Cir. 2015); *see United States v. Blitch*, 773 F.3d 837, 846 (7th Cir. 2014) (under Section 846, government must prove that defendants agreed to acquire cocaine for distribution) (citation omitted)). To support a conspiracy conviction, the Government must establish beyond a reasonable doubt that "there was a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Johnson*, 437 F.3d 665, 675 (7th Cir. 2006). Here, the Government needed to demonstrate that Jones's relationship with his co-defendants was "more than a mere association," *see United States v. Sullivan*, 903 F.2d 1093, 1098-99 (7th Cir. 1990), but a jury may infer an agreement from the parties' course of dealing. *See United States v. Sanchez*, 251 F.3d 598, 602 (7th Cir. 2001). Jones raises two arguments in support of his position that the Government presented insufficient evidence on the conspiracy charge. He argues first that the evidence established that he simply maintained a buyer-seller relationship with Calvin Nelson; and second, mounts a general credibility attack on both Nelson and Edward Parker's testimony. Neither argument warrants acquittal.

"Evidence that the defendant was in a mere buyer-seller relationship with the alleged coconspirator is insufficient to establish a conspiracy." *Johnson*, 437 F.3d at 675 (citing *United States v. Rock*, 370 F.3d 712, 714 (7th Cir. 2004)). While universally, all drug deals involve unlawful agreements to distribute drugs, "a buyer-seller arrangement can't be itself the basis of a conspiracy conviction because there is no common purpose[.]" *See Cruse*, 805 F.3d at 811

(quoting *United States v. Long*, 748 F.3d 322, 325 (7th Cir. 2014)). A conspiracy conviction requires evidence of commonality of purpose amongst the coconspirators. *See Long*, 748 F.3d at 325. "Whether the evidence establishes a conspiratorial agreement must ultimately be determined by the totality of the circumstances, and [courts] conduct a 'holistic assessment of whether the jury reached a reasonable verdict.' " *Cruse*, 805 F.3d at 811 (quoting *United States v. Brown*, 726 F.3d 993, 1002 (7th Cir. 2013)).

Here, the Government presented overwhelming evidence that revealed the existence of a conspiracy amongst Jones, James, and Nelson and not merely buyer-seller relationships. The most important evidence of the conspiracy came from Nelson's testimony itself.[3] The Government called Nelson as its cooperating witness. Nelson apprised the jury that he lived with Jones, was arrested for and pled guilty to conspiring to sell drugs with Jones, and that he was a drug addict. (Trial Tr. 401-406.) Nelson testified that from February 2010 to June 2012, he lived in the second floor apartment at 607 East 60th Street. (Trial Tr. 408.) Nelson said that Jones chose the building in 2010 because he wanted James and Nelson to live under the same roof so their joint drug operation would look less conspicuous. (Trial Tr. 411-12.) James accordingly moved into the third floor of the building and although Jones did not officially move in as well, he stayed there occasionally and was around often. (Trial Tr. 412-13.)

Nelson told the jury that at Jones's behest and control, he, Jones, and James sold drugs together as a team. *See United States v. Moon*, 512 F.3d 359, 364 (7th Cir. 2008) (upholding conspiracy conviction where evidence implied parties worked together). Specifically, they sold powder cocaine, crack cocaine, and heroin. (Trial Tr. 413.) Nelson knew the difference between cocaine and heroin because he had seen them before; cocaine is white while heroin is brown. (Trial Tr. 494.) Nelson testified that Jones would often leave drugs with James who would in

---
[3] Jones's credibility argument is addressed later in this opinion.

turn provide it to individuals that came to pick up. (Trial Tr. 413.) Jones's use of James to distribute drugs is independently enough to sustain Jones's conspiracy conviction. *See Cruse*, 805 F.3d at 812 ("Cooperation with a middleman is a conspiracy per se because the dealer and the middleman have agreed to work together to distribute drugs to third parties."); *see also United States v. Pulgar*, 789 F.3d 807, 815 (7th Cir. 2015) (finding insufficient evidence of conspiracy where there was no middleman). Nelson gave an extremely detailed rendition of how Jones directed James to pass out drugs. James stored drugs in the cushion of a couch in his third floor apartment and, at Jones's direction, would distribute those drugs to buyers and collect money for Jones. (Trial Tr. 414.) Jones would call James, tell him who was coming to pick up, and James would issue the proper amount and collect the money owed. (Trial Tr. 415-18.) Nelson testified that he also witnessed James receive drugs for Jones at least five times in the relevant time period. (Trial Tr. 419-20.) James did not store, sell, or collect drugs for anyone other than Jones. (Trial Tr. 420.)

Nelson had the same job description. He sold drugs and collected money for Jones, operating out of his garden level apartment in the same building. (Trial Tr. 421.) Buyers would knock on his window, he would let them in, and he would provide whatever it was that Jones told him to give the buyers. (Trial Tr. 421.) Specifically, Nelson testified that he provided powder cocaine to a customer named Chris on behalf of Jones at least ten times. (Trial Tr. 455.) Nelson collected the money from Chris and gave it to Jones, who in turn would give him his commission. (Trial Tr. 456). *See Miller*, 782 F.3d at 798 (shared proceeds can evidence drug conspiracy). Similarly, at Jones's direction, Nelson sold crack cocaine to Chris, Smooth, and an individual Nelson called "the little white girl." (Trial Tr. 465.) Nelson also sole heroin to Jones's customers many times. (Trial Tr. 496-500.) Nelson occasionally needed to utilize a scale,

5

provided by Jones, to measure the appropriate amount of crack cocaine to provide to Jones's customers. (Trial Tr. 473; 475.) *See Pulgar*, 789 F.3d at 813 (circumstantial evidence of drug trafficking conspiracy may include "provision of tools to advance the distribution"). Nelson also stored powder cocaine, crack cocaine, and heroin in his apartment for Jones. (Trial Tr. 421-22.) Nelson did not distribute drugs for anyone else between 2010 and 2012. (Trial Tr. 422.) Additional evidence of the conspiracy came from Jones's method of payment to Nelson for deals: Jones would pay him ten dollars per customer served. (Trial Tr. 422.) *See Pulgar*, 789 F.3d at 813 (evidence of conspiracy may be "payment of commission on sales"). Nelson additionally testified that because he was a substantial user of crack cocaine, Jones would provide him with drugs and Nelson would then "work it off." (Trial Tr. 422-424.) This is another indication that the jury reasonably relied upon when concluding that Jones was operating a drug trafficking conspiracy. *See Pulgar*, 789 F.3d at 813 (sales on consignment constitute circumstantial evidence of conspiracy).

Nelson's testimony itself provided copious evidence that Jones led and controlled a drug trafficking conspiracy and the jury's verdict is supported by his testimony alone.[4] Jones valued Nelson's participation in the conspiracy so much that he refused to let him get involved in any other illicit scheme. (Trial Tr. 522.) Jones's challenge to Nelson's credibility on the witness stand is not only tenuous, but also may be summarily dismissed because credibility determinations are reserved for the jury. First and foremost, Jones's argument is belied by the record; Nelson's testimony was extremely detailed, his memory was sharp, and his demeanor was calm throughout his time on the witness stand. Nevertheless, even if there were concerns

---

[4] Nelson's testimony also provided the grounds for the jury's determination that Jones distributed more than five kilograms of cocaine and 280 grams of cocaine base. *See* Trial Tr. 426-27 (ten kilograms of cocaine); 429 (five kilograms of cocaine); 432 (five kilograms of cocaine); 446 (two and a half kilograms of cocaine); 467 (thousands of dollars worth of crack cocaine); 468 (approximately 140 grams of crack cocaine); 470 (approximately 35 grams of crack cocaine every two weeks); 491 (at least 100 grams of heroin); 492 (one kilogram of heroin).

with Nelson's credibility, the Court would not reverse the jury's verdict for that reason. *See United States v. Sewell*, 780 F.3d 839, 847 (7th Cir. 2015) (When considering a Rule 29 motion premised on insufficient evidence, courts "neither weigh evidence nor assess the credibility of witnesses; that task is for the trier of fact.") (citation omitted).The fact that Jones cooperated with the Government and is an admitted drug addict does nothing to alter the Court's analysis. *See United States v. Pulido*, 69 F.3d 192, 206 (7th Cir. 1995) ("[A] conviction for conspiracy may be supported by testimony that is 'totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant.' ") (quoting *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir. 1989)). The Court accordingly defers to the judgment of the jury.[5]

Even though the jury could have relied solely on Nelson's testimony, the Government also introduced scores of phone conversations between Jones and his coconspirators and law enforcement surveillance testimony that corroborated Nelson's statements. The evidence presented at trial was therefore well beyond sufficient to sustain Jones's conspiracy conviction.

### B. Counts Two, Six, & Nine—Distribution of Controlled Substances

Section 841 provides that it is "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1). To convict a defendant under this section, the Government must establish that the defendant knowingly possessed a controlled substance, intended to distribute it, and knew that it was a controlled substance. *See United States v. Pellmann*, 668 F.3d 918, 923 (7th Cir. 2012).

Count Two of the superseding indictment charged Jones with distributing cocaine on November 16, 2011. Recorded phone calls on November 15 and 16, 2011 showed that Jones told

---
[5] Jones's attack on Parker's credibility fails for the same reasons.

7

Odell Givens to contact James, "the crippled dude," regarding a drug pick up. Givens spoke to James, who told him that Jones had left drugs for him at the 607 East 60th Street building. Givens picked up the narcotics that day. James told Givens over the phone that he would throw the key to the building down to him when he arrived and video surveillance showed James do just that. (Trial Tr. 152; 159.) Law enforcement video-recorded Givens enter the building for a few minutes and exit with a brown paper bag, which he hid in his trunk. Law enforcement proceeded to follow Givens to a meeting with a customer, Karvis Carter, and recorded conversations established that Givens was delivering the cocaine to Carter after leaving the 607 East 60th Street building. (Trial Tr. 164.) This evidence presented at trial led the jury to the very reasonable conclusion that Givens collected cocaine from Jones through James and flipped it to a third party. The evidence presented at trial supports Jones's conviction on Count Two of the superseding indictment.

Count Six charged Jones with distributing cocaine and heroin on January 19, 2012 while Count Nine charged Jones with distributing cocaine and heroin on February 15, 2012. On both dates, recorded calls documented Jones negotiating heroin sales with Jarvis Paige. On January 18, 2012, Paige sought "the same old cold seven up and them black pants I told you about." Law enforcement testimony established that these words were code for crack cocaine and heroin. On the 19th, law enforcement observed James meet with Paige outside the 607 East 60th Street building and a later call between Jones and Paige involved Jones instructing Paige on what sleeping pills to purchase for cutting the heroin. (Trial Tr. 118-21.) Similarly, on February 15, 2012, Paige told Jones that he needed "fourteen of the chicken," meaning crack, and "four g's of the brown," meaning heroin. Paige intended to pay around $350 for the four grams of heroin, and this amount aligned with Special Agent Mark Anton's testimony concerning drug pricing. After

8

consummating the transaction at the 607 East 60th Street building, Rockford police officers stopped Paige, searched his car, and found 13.3 grams of crack cocaine and four grams of heroin inside. (Trial Tr. 221; 287; 291-92.) The phone calls, surveillance, and ultimate recovery of narcotics presented to the jury was more than sufficient to sustain the jury's convictions on Counts Six and Nine of the superseding indictment.

### C. Count Four—Possession with Intent to Distribute Controlled Substances

To sustain Jones's conviction on Count Four, the Government had to prove beyond a reasonable doubt that Jones "knowingly or intentionally possessed a controlled substance with the intent to distribute it, while knowing that it was a controlled substance." *United States v. Bentley*, 795 F.3d 630, 637 (7th Cir. 2015); *see* 21 U.S.C. § 841(a)(1). In Count Four of the superseding indictment, the Government charged Jones with possessing cocaine with the intent to distribute on January 12, 2012. On that date, phone calls amongst Jones, Givens, and Parker showed that Jones needed a shipment of drugs from Givens and Givens sent Parker to make the delivery. Parker testified that he was going to deliver the drugs to Jones at the 607 East 60th Street building. (Trial Tr. 317.) Jones told Parker later that Nelson would be waiting for him at 607 East 60th Street. Nelson's testimony supported the jury's conviction on this charge as well. Nelson testified that on January 12, 2012, he sent Parker (a drug courier for Jones's supplier Givens) to the third floor of the building to deliver cocaine for Jones's future distribution. (Trial Tr. 451-52.) Video surveillance corroborated Nelson's statements, as law enforcement saw Parker arrive at the building and Nelson let him in. (Trial Tr. 127-29.) Jones arrived shortly thereafter. (Trial Tr. 130; 186.) Parker testified that once he was inside, he went to James's third floor apartment and gave a quarter kilogram of cocaine to Jones. (Trial Tr. 323-24.) Video surveillance then showed Parker leave the building and call Givens to confirm the delivery.

9

Parker's and Nelson's testimony, coupled with the corroborating video surveillance, provided beyond ample evidence for the jury to convict Jones on Count Four of the superseding indictment.

### D. Counts Five & Seven—Use of a Communication Facility

To be guilty of using a communication facility to facilitate the underlying drug conspiracy, the Government needed to show that Jones "(1) intentionally; (2) use[d] a communication facility; (3) to commit a felony." *See United States v. Jones ("Jones I")*, 600 F.3d 847, 855 (7th Cir. 2010) (citing 21 U.S.C. § 843(b)). The evidence presented at trial to sustain these convictions was legion and Jones does not seriously argue otherwise. First and foremost, a substantial amount of the Government's evidence came from a wiretap that necessarily involved cellular phones. *See Jones II*, 713 F.3d at 346 (evidence must show that defendant knowingly and intentionally used a telephone to facilitate drug offense). Nelson testified, early and often, that Jones would direct his drug distribution via telephone. Nelson told the jury that he and Jones used code words to disguise their drug trafficking.[6] (Trial Tr. 474; 502.) *See United States v. Arrellano*, 757 F.3d 623, 633 (7th Cir. 2014) (use of code is evidence of conspiracy participation). Specifically, on January 12, 2012, Jones called Nelson to inquire about a visit from Parker, Givens's drug courier. (Trial Tr. 451-52.) Nelson's testimony, along with the accompanying recorded calls on January 12, 2012 between Jones and Givens, Givens and Parker, Jones and Parker, Givens, Parker, and Nelson, and Jones and Nelson played to the jury, demonstrated beyond a reasonable doubt that Jones intentionally used a phone to further his drug trafficking organization, thereby satisfying all of the necessary elements for a communication facility conviction. *See Arrellano*, 757 F.3d at 633 (where defendant and

---

[6] Anton testified that Nelson's and Jones's code words were consistent with drug terminology as he knew it during the relevant time period. (Trial Tr. 952-998.)

10

coconspirator made arrangements to meet over the phone, reasonable jury "could have found that the calls were knowingly made to facilitate the conspiracy"). Similarly, on January 19, 2012, Jones spoke with Jarvis Paige twice concerning a recent heroin sale. Jones told Paige to cut the heroin with sleeping pills while also warning Paige that speaking so candidly over the phone would "get us all in trouble[.]" Jones's instruction to use sleeping pills to cut the heroin leads to the reasonable inference that he knew that Paige would cut the heroin and resell it to future customers. This conversation therefore not only evidenced Jones's use of a phone to further his drug trafficking, but also his participation in the underlying conspiracy at large.

### E. Count Ten—Attempt to Possess with Intent to Distribute

Along with providing the penalties for a drug-trafficking conspiracy, Section 846 also makes unlawful any attempt to possess controlled substances with the intent to distribute. *See* 21 U.S.C. § 846. To sustain an attempt conviction, the Government "was required to prove that [Jones] acted with the specific intent to commit the underlying crime and that he took a substantial step towards completion of the offense." *United States v. Berg*, 640 F.3d 239, 246 (7th Cir. 2011) (citations omitted); *see also United States v. Stallworth*, 656 F.3d 721, 728 (7th Cir. 2011) (attempt in Section 841 context). "The offense of attempting to possess with intent to distribute is complete when a defendant has been active in negotiating a drug transaction and has actually taken physical steps to obtain possession of a drug." *Pulido*, 69 F.3d at 206 (citing *United States v. Cea*, 914 F.2d 881, 888 (7th Cir. 1990)).

In Count Ten of the superseding indictment, the Government charged Jones with attempting to obtain 500 grams or more of cocaine on April 15, 2012 and the jury convicted Jones on this charge. The evidence supported such a conclusion. Surveillance and recorded phone calls conclusively established that Jones attempted to purchase and pick up a large

11

quantity of cocaine on that date. From April 6 to April 15, 2012, recorded phone calls revealed negotiations between Jones and Edward Delgado for a kilogram of cocaine. According to law enforcement surveilling at the time, Delgado arranged with Eduardo Medina and Javier Diaz to supply the kilogram. (Trial Tr. 707-10; 714.) Law enforcement witnessed Medina and Diaz arrive at Delgado's house the morning of April 15, 2012, but Jones was running late. Recorded phone calls corroborated this fact. Diaz eventually left the area minutes before Jones called Delgado to tell him he was almost there. Delgado told Jones that Diaz had left because "he didn't feel right." Law enforcement later stopped Diaz and recovered 1.25 kilograms of cocaine from his car. (Trial Tr. 733-34; 743.)

Jones's conduct in negotiating the sale and actually physically going to a prearranged meeting place only to be thwarted by his counterpart's nerves was more than sufficient to sustain the attempt conviction. *See United States v. Carrillo*, 435 F.3d 767, 777 (7th Cir. 2006) (finding that, after negotiating a drug deal, arriving at the location to conclude the transaction with the required sum of money was sufficient to establish that the defendant had taken a substantial step toward committing the offense). The Court therefore upholds the jury's verdict regarding Jones's attempt conviction.

### F. Count Eleven—Possession of a Firearm in Furtherance of Drug Trafficking

To sustain a conviction under Section 924(c), the Government had to prove beyond a reasonable doubt that Jones (1) possessed a firearm and that (2) his possession of the firearm was in furtherance of a drug offense. *See United States v. Duran*, 407 F.3d 828, 840 (7th Cir. 2005); *see also, e.g.*, *United States v. Bedenfield*, No. 14 C 330, 2015 WL 9183350, at *5 (N.D. Ill. Dec. 17, 2015); *United States v. Conley*, No. 11 CR 779, 2015 WL 394012, at *2 (N.D. Ill. Jan. 29, 2015). The Government charged Jones under Section 924(c) after law enforcement

recovered a handgun from Jones's Mercedes in his garage at 607 East 60th Street on June 6, 2012. Jones argues that because he was never seen with a gun nor heard discussing a gun on any of the recorded conversations, the Government failed to present sufficient evidence that Jones possessed the recovered firearm in furtherance of his underlying drug trafficking.

The evidence presented at trial proved otherwise. Regarding the first prong of Section 924(c), while there was no evidence that law enforcement physically saw Jones with the handgun at any point during the investigation, "possession can also include only constructive possession." *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). "Constructive possession may be established by demonstrating that the defendant knowingly had both the power and the intention to exercise dominion and control over the object, either directly or through others." *Id* (citing *United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009)). This required "nexus" is typically shown by demonstrating that the defendant had "exclusive control" over the property where the contraband was discovered or, in the absence of "exclusive control," by showing that the defendant had a "substantial connection" to the location where the contraband was seized. *See Griffin*, 684 F.3d at 695.

Here, the Government conclusively established that Jones had control over the garage and the Mercedes where the handgun was eventually discovered. Nelson testified that Jones sometimes kept heroin in the Mercedes in Jones's garage. (Trial Tr. 524.) The parties read a stipulation to the jury that license plates found in the trunk of the Mercedes were registered to Jones. Nelson did not have a key to the garage and could only enter it with Jones, who always had the key to the padlock. (Trial Tr. 530-31; 536.) Nelson said that when Jones would take him into the garage, Jones would open a "trap door" in his Mercedes so he could store drugs and money inside. (Trial Tr. 541-46; 549.) Similarly, Douglas Emde, the landlord of the building

13

where Jones ran his drug trafficking operation, testified that Jones had been using the garage since Nelson and James began living in the building. (Trial Tr. 689.) Jones told Emde that he was going to continue to use the garage and actually sought a padlock to further secure the garage. (Trial Tr. 689-90.) Emde installed a security gate on the garage door and gave Jones the padlock and key. (Trial Tr. 690-91.) Only Jones and Emde had keys to the garage. (Trial Tr. 691.) A reasonable jury could, and did, rely on this testimony when concluding that Jones controlled the garage and therefore constructively possessed the handgun found within.

Turning to the second prong, the "in furtherance of" element of Section 924(c) requires "that the weapon further, advance, move forward, promote or facilitate the drug-trafficking crime, and that the possessed gun further a drug-trafficking offense by providing the dealer, his stash, or his territory with protection." *United States v. Eller*, 670 F.3d 762, 765 (7th Cir. 2012) (citing *United States v. Huddleston*, 593 F.3d 596, 602 (7th Cir. 2010)). Mere proximity of a firearm to a location where drugs are stored or sold is not enough itself to satisfy this element; instead, to sustain a conviction, the evidence must establish that there is "some nexus between the firearm and the drug-selling operation." *Eller*, 670 F.3d at 765. When determining whether this nexus exists, the Court considers a number of factors, including: "(1) the type of drug activity that is being conducted; (2) accessibility of the firearm; (3) the type of weapon possessed; (4) whether the weapon is stolen; (5) the status of the possession (legitimate or illegal); (6) whether the gun is loaded; (7) proximity to drugs or drug profits; and (8) the time and circumstances under which the gun is found." *Id.* at 766 (citing *United States v. Seymour*, 519 F.3d 700, 715 (7th Cir. 2008)).

The Government satisfied this prong beyond a reasonable doubt as well. At trial, the Government presented evidence to the jury that Jones built and ran a highly successful and

14

prominent drug trafficking operation from the 607 East 60th Street building, valued in the hundreds of thousands of dollars (at least). Additionally, a recorded call showed that Jones used the garage to meet a narcotics supplier. Moreover, law enforcement recovered the gun from a hidden compartment in Jones's Mercedes, the gun was right next to thousands of dollars likely stemming from drug trafficking, the gun was loaded, and law enforcement found matching ammunition inside Jones's apartment. (Trial Tr. 747.) All of this was indicia for the jury to believe that Jones possessed his firearm "in an attempt to fortify and protect his product and proceeds." *Eller*, 670 F.3d at 766; *see also United States v. Fouse*, 578 F.3d 643, 651 (7th Cir. 2009) (factors indicated that the guns "were not used for ordinary personal protection but rather to thwart those who might try to relieve [the defendant] of his inventory and profits"). Accordingly, the Court denies Jones's Rule 29 motion with respect to his conviction under Count Eleven.

## II. The Alleged New Information and Trial Errors Do Not Justify a New Trial

Rule 33(a) of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a); *see also United States v. Berg*, 714 F.3d 490, 500 (7th Cir. 2013); *United States v. Smith*, 674 F.3d 722, 728 (7th Cir. 2012) (reviewing a district court's order on a Rule 33 motion for abuse of discretion). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006); *see also United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (" '[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial.' "). The Court

"approach[es] such motions with great caution" and a jury verdict in a criminal case is not to be overturned lightly. *See United States v. McGee*, 408 F.3d 966, 979 (7th Cir. 2005); *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). Here, Jones argues that newly discovered evidence and a number of trial errors justify a new trial in his case. None of Jones's arguments, either individually or cumulatively, warrant a new trial.[7]

### A. Newly Discovered Evidence

In a single paragraph, Jones contends that new evidence has come to his attention since his conviction. Specifically, he states that a number of other criminal prosecutions in this District are tangentially related to his case and that the prosecutors never disclosed the discovery in these cases.[8] Newly discovered evidence can be used to demonstrate the need for a new trial if the defendant provides evidence that "(1) came to his knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial." *United States v. Westmoreland*, 712 F.3d 1066, 1072 (7th Cir. 2013) (citations omitted)).

Jones's failure to establish that the alleged new evidence is material dooms this aspect of his motion for new trial. Jones contends that discovery in a number of other cases pending in this District may have relevance to his case and because Jones never received any, he is owed a new trial. Jones acknowledges that he "cannot answer whether the evidence is material and would lead to an acquittal." This, of course, is his burden to establish and his failure to do so condemns his argument. Nevertheless, the Government's response concretely establishes that any evidence in other pending cases has no relevance to Jones's situation.

---

[7] Jones additionally argues that the jury's verdict was contrary to the weight of the evidence. For the reasons discussed above, a reasonable jury could, and did, convict under the evidence presented.
[8] Jones explicitly points to *United States v. Hoskins*, No. 13 CR 772.

The Government states that Jones was originally arrested pursuant to a criminal complaint charging him and eighteen other defendants for controlled substance violations. The Government eventually indicted Jones and his two codefendants in this case, while the remaining sixteen defendants from the criminal complaint were charged in twelve separate cases. The underlying investigation into the nineteen total defendants stemmed from a wiretap, and Jones's connection to the other defendants is solely because Givens, one of Jones's suppliers, also happened to be a narcotics supplier for the Hoskins defendants. This happenstance is not material to Jones's prosecution, much less indicative of an acquittal had Jones been armed with this information before trial. The Government states that Jones was never intercepted on any phone call with a Hoskins defendant, and this further distances his prosecution from theirs. There is simply no indication whatsoever that the Government failed to provide Jones with relevant evidence from any of the other criminal investigations caused by the common wiretap.[9]

B. **Trial Errors**

In a series of single-sentence declarations, Jones contends that a number of errors require a new trial. Specifically, he cursorily argues that the Court erred by denying Jones's pretrial motions, overruling some of Jones's objections during trial, using the Government's proposed jury instructions that Jones objected to, and sustaining some of the Government's objections throughout trial. Jones fails to support his arguments in any meaningful way whatsoever. His contentions wholly lack legal authority, factual analysis, or substantiated development. Jones's throwaway arguments regarding trial error are therefore waived. *See United States v. Alden*, 527 F.3d 653, 664 (7th Cir. 2008) (Arguments that are inadequately developed or fail to cite

---

[9] The Government disclosed that it neglected to turn over the wire applications, affidavit, and orders for two phones involved in the wiretap. One call between Jones and Givens was recorded on one of these phones; however, it did not pertain to narcotics trafficking. There is no evidence or argument that this oversight prejudiced Jones in any way.

substantive legal authority are waived "[b]ecause it is not the obligation of this Court to research and construct the legal arguments available to parties[.]"); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."). The Court denies Jones's motion for a new trial.

## CONCLUSION

For the reasons stated herein, the Court denies Jones's motions for judgment of acquittal and for a new trial.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 2/12/2016